**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| TIFFANI ELIZABETH PIRTLE, <br><br> Plaintiff, <br><br> vs. <br><br> COMMISSIONER, SOCIAL SECURITY ADMINISTRATION, <br><br> Defendant. | CASE NO. 1:25-CV-660-AMK <br><br> MAGISTRATE JUDGE AMANDA M. KNAPP <br><br> **MEMORANDUM OPINION AND ORDER** |

Plaintiff ("Plaintiff" or "Ms. Pirtle") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 14.)

For the reasons set forth below, the final decision of the Commissioner is **AFFIRMED**.

## I.    Procedural History

On December 1, 2022, Ms. Pirtle filed an application for DIB, alleging a disability onset date of December 1, 2022.[1]  (Tr. 189-95.)  She alleged disability due to diabetes, anxiety attacks, and diabetic neuropathy.  (Tr. 242.)  Her application was denied at the initial level (Tr. 71-80) and upon reconsideration (Tr.81-89), and she requested a hearing (Tr. 107-08).  On April 25, 2024, a telephonic hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 31-70.)

---

[1] This was later amended to November 18, 2022. (Tr. 16.)

1

On May 13, 2024, the ALJ issued a decision finding Ms. Pirtle has not been under a disability within the meaning of the Social Security Act from November 18, 2022, through the date of the decision.  (Tr. 12-29.)  Ms. Pirtle sought review of the decision by the Appeals Council.  (Tr. 187-88.)  On March 5, 2025, the Appeals Council found no reason to review the decision, making the decision the final decision of the Commissioner.  (Tr. 1.)

Ms. Pirtle filed the present Complaint on April 3, 2025 (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 9, 11, 12).  In two assignments of error, Ms. Pirtle argues the ALJ: (1) failed to evaluate the persuasiveness of Plaintiff's symptoms pursuant to 20 C.F.R. § 404.1529 and SSR 16-3p; and (2) failed to identify substantial evidence supporting the RFC finding and failed to evaluate the medical opinions pursuant the regulations.  (ECF Doc. 9, pp. 10-25.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Pirtle was born in 1977 and was 45 years old on the alleged disability onset date, making her a younger individual under Social Security regulations on the alleged onset date. (Tr. 25.)  She has at least a high school education.  (*Id.*)  Ms. Pirtle has not worked since November 18, 2022, the alleged onset date.  (Tr. 16.)

### B.     Medical Evidence

#### 1.     Treatment History Prior to Relevant Period

On March 16, 2020, Ms. Pirtle saw Sarah Beattie, APRN-CNP for a med check and review of labs.  (Tr. 390-94.)  She reported that she had been off her medication, was having glucose levels spike at night while she was working, was experiencing excessive daytime sleepiness, and her toes were tingling "all the time."  (Tr. 390.)  She reported that her major depressive disorder ("MDD") and generalized anxiety disorder ("GAD") were worsening, and

2

she was under a lot more stress at home.  (*Id*.)  She reported that she missed about one day per month due to this and was using Family and Medical Leave Act ("FMLA") intermittently.  (*Id*.)  Her PHQ-9 score was 18, and her GAD-7 score was 16.  (*Id*.)  On examination, she was mildly anxious and had lost a toenail on her left foot, but other findings were normal.  (Tr. 392.)  Her medications included Sertraline HCL and Tramadol; CNP Beattie increased her dosage of Sertraline and added Hydroxyzine for MDD and GAD.  (Tr. 391-93.)

CNP Beattie treated Ms. Pirtle for worsening anxiety on May 19, 2020.  (Tr. 395-98.)  Ms. Pirtle reported that "the increase in the Zoloft was effective and really feels great outside of work," but she had panic attacks due to having to wear a mask at work and felt like she could not breathe.  (Tr. 395.)  She requested a lower dose of hydroxyzine because it made her sleepy.  (*Id*.)  Examination results were normal, including normal mood and affect.  (Tr. 397-98.)  Her PHQ-9 score was 13, and her GAD-7 score was 17, but CNP Beattie noted that "[t]hough her scores are not much improved she feels that she is really making headway in her depression symptoms and really her anxiety symptoms overall it is just the masking making her anxious."  (Tr. 395, 398.)

On June 11, 2020, Ms. Pirtle returned to CNP Beattie and asked for documentation for FMLA due to caring for her son and anxiety issues.  (Tr. 399-402.)  She needed 1-2 days per month coverage, but sometimes didn't need any time off in a month.  (Tr. 399.)  She reported that she had recently missed work due to blood glucose in the 40-60 range.  (*Id*.)  She attributed the hypoglycemia to anxiety.  (*Id*.)  Examination results were normal, except her mood and affect were anxious and tearful.  (Tr. 401.)  CNP Beattie indicated that FMLA would be continued for diabetes mellitus and anxiety at 2 days maximum per month.  (Tr. 402.)  Another FMLA form was completed for June 8 to 28, 2020 due to Ms. Pirtle needing to arrange care for her son.  (*Id*.)

CNP Beattie treated Ms. Pirtle for increased anxiety and extension of her FMLA on June 23, 2020.  (Tr. 403-06.)  Ms. Pirtle reported she was very upset and anxious about her father's illness, and her anxiety was much worse because of this.  (Tr. 403.)  She reported that she could not concentrate appropriately to operate the machine at work due to her anxiety but had not yet gotten counseling.  (*Id*.)  Her GAD-7 score was 19, and her PHQ-9 score was 16.  (*Id*.)  On examination, her mood and affect were agitated, anxious, and tearful.  (Tr. 405.)  She had a large wound to the plantar aspect of her left great toe.  (*Id*.)  CNP Beattie extended Ms. Pirtle's FMLA and referred her to podiatry.  (Tr. 406.)

On November 19, 2020, Ms. Pirtle saw Arun Nag Mallapareddi, M.D., and reported worsening anxiety and stress relating to family circumstances. (Tr. 407- 10.)  She said she was seeing a counselor weekly and had been diagnosed with a trauma stressor related disorder.  (Tr. 407.)  She had not been to work since November 17 and planned to return to work on November 30.  (*Id*.)  On examination, she was mildly anxious. (Tr. 409.)  She reported that her depression mediation was no longer effective, so Dr. Mallapareddi started her on Escitalopram.  (Tr. 409.)

### 2.        Treatment History During Relevant Period

On December 9, 2022, Ms. Pirtle saw Chad Kaufman, PASUP for an assessment at Shiloh Medical Services.  (Tr. 317-18.)  When asked whether she felt stressed (tense, restless, nervous, or anxious, or unable to sleep at night), she answered "very much."  (Tr. 318.)  She reported she was following a "regular" diet, with no restrictions.  (Tr. 317.)  On December 10, 2022, laboratory results showed Ms. Pirtle had abnormally high glucose levels of 372 mg/dL.  (Tr. 320.)  Her hemoglobin A1c level was also abnormally high at, 10.2%.  (Tr. 321.)

Ms. Pirtle attended a 4-week follow up with PA Kaufman on January 12, 2023.  (Tr. 363-66, 378-84.)  Her BMI was 35.2 with a weight of 245 pounds.  (Tr. 363.)  When asked whether

4

she felt stressed (tense, restless, nervous, or anxious, or unable to sleep at night), she answered "very much." (Tr. 365.) She said she was unable to get her Ozempic due to a national shortage. (*Id.*) Her physical examination results were normal, including normal motor strength and normal gait. (Tr. 366.) PA Kaufman prescribed Rybelsus and Jardiance for type 2 diabetes mellitus, noting that insulin could be substituted if Rybelsus and Jardiance were not covered by insurance. (*Id.*) PA Kaufman also continued her prescriptions for Atorvastatin, Buspirone, and Sertraline. (Tr. 380.) Her prescription for Jardiance was approved on January 20, 2023. (Tr. 374.)

Ms. Pirtle underwent a physical consultative evaluation with Barbara McFarlane, CNP, on April 13, 2023. (Tr. 339-50.) Ms. Pirtle reported a history of diabetes, anxiety, and diabetic neuropathy. (Tr. 345.) She reported her diabetes began approximately five years prior, and that her anxiety caused her blood sugar to rise, though she also acknowledged having a "bad diet." (*Id.*) Her last A1c was three months prior, and it was 10.2. (*Id.*) Her fasting glucose was normally around 100 to 110. (*Id.*) Her blood sugar was usually 225 after eating. (*Id.*) She reported that medications provided relief. (*Id.*) She also reported diabetic neuropathy that caused tingling in her legs but denied numbness. (Tr. 346.) Her ankles would swell if she dangled her legs in a seated position. (*Id.*) Her anxiety began about six years prior and was worsened by stress, stores, large crowds, and driving on the freeway. (Tr. 346.)

Ms. Pirtle reported that she was independent in most activities of daily living, although her husband sometimes accompanied her when shopping for emotional support. (*Id.*) She reported she was able to perform self-care, housework, cook, clean, manage funds, and perform yard work independently. (*Id.*) She drove herself to the appointment. (Tr. 345.) She was taking Rybelsus and Jardiance for diabetes and Zoloft and Buspar for anxiety. (Tr. 346.)

On examination, Ms. Pirtle displayed: 5/5 grip strength and motor function in all extremities; a normal, steady gait; and no signs of anxiety.  (Tr. 347-48.)  She was able to get on and off the examination table, hop, bend, and squat without any difficulties.  (Tr. 348.)

On April 24, 2023, Ms. Pirtle underwent a telehealth psychological examination with consultative examiner Taylor Groneck, Psy.D.  (Tr. 351-59.)  Ms. Pirtle reported a history of panic attacks and anxiety at her previous job, where she worked 12-hour shifts.  (Tr. 352.)  Her supervisor would find her "in a fetal position trying to breathe and calm down."  (*Id.*)  Her husband took her to the emergency room from work when her blood sugar fell to 45 and would not go back up.  (Tr. 353.)  She was on FMLA leave twice in 2021 due to her anxiety and blood sugar.  (*Id.*)  She had panic attacks with the thought of returning to work, which caused pain "from head to toe," sickness, vomiting, and diarrhea.  (*Id.*)

On examination, Dr. Groneck noted Ms. Pirtle was "a quietly cooperative woman," with easy rapport, good motivation, and fidgety posture.  (Tr. 355.)  Her speech was clear and understandable, but circumstantial at times, and she had to be reoriented to topic at least four times.  (Tr. 356.)  Her receptive language skills were marginally adequate.  (*Id.*)  She appeared depressed and anxious, with dysphoric affect and a nervous facial expression. (*Id.*)  She seemed to have low energy and displayed signs of anxiety including fidgetiness, a shaky voice, and an apprehensive facial expression.  (*Id.*)  Dr. Groneck noted, "Behavioral observations matched her self-report of symptoms."  (Tr. 357.)  Dr. Groneck assessed unspecified depressive disorder with anxious distress and GAD with panic attacks.  (*Id.*)

On April 23, 2024, PA Kaufman treated Plaintiff for ongoing blood sugar issues and anxiety issues.  (Tr. 415-27.)  She was not taking any of her medications "because of the way they make her feel or the cost."  (Tr. 415.)  She wanted to be on insulin.  (*Id.*)  She was "unhappy

but composed," and "put out" with the "politics and pricing" of health care. (*Id*.) When asked whether she felt stressed (tense, restless, nervous, or anxious, or unable to sleep at night), she answered "very much." (Tr. 417.) She had not seen a Shiloh Health provider in a year and a half, and reported she felt good with a fasting blood sugar of 90-120, and without medications 120-150. (Tr. 418.) She also reported confusion, fatigue, and not restful sleep. (*Id*.) On examination, she was overweight, with a BMI of 32. (Tr. 419.) She had a pins and needle sensation when she was touched on the bilateral lower extremities up to halfway to her knee. (*Id*.) Paresthesia to light touch was noted for her bilateral feet. (*Id*.) PA Kaufman resumed her prescriptions for Rybelsus and Jardiance, noting that she could switch to insulin if the medications were not approved through insurance, and prescribed Metformin ER and Mounjaro to treat her diabetes. (*Id*.) PA Kaufman also restarted Sertraline for GAD. (*Id*.) Gabapentin was prescribed for diabetic peripheral neuropathy. (*Id*.) Her hemoglobin A1c was abnormally high at 11.3%. (Tr. 421.) Her blood glucose level was abnormally high at 329 mg/dL. (Tr. 423.)

### 3. Opinion Evidence

#### i. Consultative Examiners

Following a physical consultative examination on April 13, 2023, CNP McFarlane opined that Ms. Pirtle could stand/walk for less than 2 hours a day due to diabetic neuropathy but had no limitations for sitting. (Tr. 349.) She could lift 50 pounds occasionally and 25 pounds frequently. Tr. 350. (*Id*.) CNP McFarlane opined that Ms. Pirtle had no other physical limitations. (*Id*.) She further opined that Ms. Pirtle would benefit from a dietician and a medication like Gabapentin for her diabetic neuropathy. (*Id*.)

On April 24, 2023, following a psychological consultative examination, Dr. Groneck assessed Ms. Pirtle's functional limitations as follows:

- "During the interview, the claimant had difficulty focusing. She appeared easily distracted and asked for questions to be repeated to her. From a mental health perspective, depressive symptoms may present barriers to adequate focus and concentration. Additionally, the claimant's persistence and pace may be lessened by decreased energy and anxiety." (Tr. 357-58.)

- "She is not expected to show problems getting along with coworkers, supervisors, or the general public. However, due to reported panic attacks, the claimant may experience increases in symptoms when working in crowded work environments." (Tr. 358.)

- "Due to depression, the claimant will likely struggle to adapt to change in work routine. She appears to have low frustration tolerance and may have difficulty coping with changes in her work routine. Additionally, panic attack symptoms may increase when the claimant is in a high stress environment." (*Id*.)

### ii.      State Agency Medical Consultants

On April 24, 2023, state agency medical consultant Maria Maxwell, M.D., opined that Ms. Pirtle's physical impairments were non-severe.  (Tr. 74.)  On reconsideration, on August 4, 2023, James Cacchillo, M.D., affirmed Dr. Maxwell's findings.  (Tr. 83.)

On May 14, 2023, state agency psychological consultant Matthew Wong, Ph.D., identified Anxiety and Depression as severe disorders, with the following functional limitations:

- she is capable of simple routine work tasks that do not require fast paced production standards.  (Tr. 77.)

- she is capable of superficial interaction with the general public, supervisors and coworkers.  (Tr. 78.)

- she is capable of routine tasks that do not require frequent changes.  (*Id*.)

On reconsideration, on August 18, 2023, Larry Kravitz Psy.D., affirmed Dr. Wong's findings. (Tr. 84-85, 87-88.)

### C.      Function Report

Ms. Pirtle completed a function report in January 2023.  (Tr. 18, 260-68.)  She explained that she could not work because she was anxious, shaky, and weak when her blood sugar got too high, which made it hard to stand up and move.  (Tr. 260.)  She experienced anxiety and panic

8

when someone walked up to her with a question. (*Id*.) She reported activities of daily living that included getting her autistic child ready for school, helping him with homework, cleaning, driving her ill parents to medical appointments, completing personal care tasks, cooking from scratch daily, doing laundry, taking out the trash, mowing when it was too much for her husband, driving, crocheting, spending time with others by text and video chat, having lunch with others rarely, and handling finances. (Tr. 262-65.) She tried to complete tasks like shopping for groceries as quickly as she could because she was anxious around lots of people and did not like to go out of the house. (Tr. 264-65.) She got along with authority figures "good," and had no problems getting along with family, friends, neighbors, or others, but rarely saw her friends in person. (Tr. 265-66.) She explained that she had a hard time concentrating for more than five minutes, she sometimes mixed-up spoken instructions, she followed written instructions well, she did not handle stress well, and changes in routine caused anxiety. (Tr. 266-67.)

**D.      Hearing Testimony**

**1.      Plaintiff's Testimony**

At the hearing on April 25, 2024, Ms. Pirtle testified in response to questions from the ALJ and her attorney. (Tr. 32-68.) She reported that she lived with her husband, 11-year-old son, and mother in her mother's single-level home. (Tr. 41, 50.) Her father died in December. (*Id.*) She had a driver's license but rarely drove because she found it difficult due to her anxiety. (Tr. 42.) She was a high school graduate. (*Id*.) Her daily tasks on a typical good day included cleaning her home, doing laundry, Bible journaling, running errands or going to doctor's appointments, and sometimes driving her mother-in-law to doctor's appointments. (Tr. 52-53.) Her hobbies included crocheting and playing games online. (Tr. 59.) She could shop independently at small stores like Dollar General, but was overwhelmed at Walmart and needed

her husband to accompany her.  (Tr. 54-55.)  She could mow the lawn on a riding mower. (Tr. 56.)  On a bad day, she was in too much pain to do anything but sit in a chair with her feet up. (Tr. 57.)  She treated the pain with Tylenol and ibuprofen.  (*Id*.)  She could not attend church because there were quite a few people in a small church, which could cause a panic attack.  (Tr. 60.)  She had some "very close and dear friends" she kept in touch with through Facebook messenger and phone calls.  (*Id*.)

She previously worked as a packer and machine operator for Liquibox. (Tr. 43-44.) Other prior work included inventory auditing, managing an exercise studio, trimming plastic lids and totes, cashier, cake decorator, and receptionist work.  (Tr. 44-48.)  She stopped working in October 2022 because of her anxiety and panic attacks.  (Tr. 49.)  The thought of starting a new job made her very anxious.  (Tr. 63.)  She did not know if she could function to take care of her autistic child if she had to go back to work, because her anxiety was so intense.  (*Id*.)

Ms. Pirtle said she was unable to work due to her anxiety and the need to alternate sitting and standing.  (Tr. 63.)  She experienced anxiety and panic attacks, for which she took medication prescribed by her primary care provider; but she had not had a bad panic attack since the beginning of the year.  (Tr. 57-58.)  She also took medication for diabetes and neuropathy. (Tr. 58.)  She did not see a mental health provider for anxiety, but she believed she needed to; she did not have any mental health hospitalizations.  (Tr. 58-59.)  She explained that "a lot of" the reason she had received limited treatment was due to financial constraints.  (Tr. 62.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the limitations described in Plaintiff's RFC could perform representative jobs of marker, routing clerk, and inspector-hand packager.  (Tr. 67-68.)  If the

individual would be off task 15% of the day, that would eliminate competitive employment, because the tolerance for off-task behavior is limited to 10% of the workday.  (Tr. 68.)  Being absent more than one day a month would also be work preclusive.  (Tr. 69.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

11

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520, § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform other work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his May 22, 2024 decision, the ALJ found Ms. Pirtle has the following severe

impairments: diabetes with neuropathy, obesity, and affective and anxiety-related disorders. (Tr.

16.) The ALJ further found she does not have an impairment or combination of impairments that

meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1. (Tr. 17.) The ALJ articulated the following RFC:

> The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; and frequently balance. She cannot work at unprotected heights or around moving mechanical parts. She can perform simple routine repetitive tasks but not at a production rate pace (e.g., no assembly line work). She can make simple work-related decisions. She can frequently interact with supervisors and occasionally with coworkers and the public.

(Tr. 20.) Considering Ms. Pirtle's age, education, work experience, and residual functional

capacity, the ALJ found there are jobs that exist in significant numbers in the national economy

the claimant can perform, including marker, routing clerk, and inspector-hand packager. (Tr. 25-

26.) The ALJ therefore found Plaintiff had not been under a disability, as defined in the Social

Security Act, from November 18, 2022, through the date of the decision. (Tr. 24.)

12

## V.     Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      First Assignment of Error: The ALJ Appropriately Evaluated Plaintiff's Symptoms**

In her first assignment of error, Ms. Pirtle argues that the ALJ did not properly evaluate the persuasiveness of her subjective reports of mental health symptoms—particularly her reports regarding the impact of stress, anxiety, and panic attacks on her ability to work—and "failed to build an accurate and logical bridge between the evidence and the finding that Plaintiff's allegations were inconsistent with the record." (ECF Doc. 9, pp. 10-16.)  The Commissioner responds that that the ALJ properly evaluated Ms. Pirtle's mental health symptoms, including considering whether the allegations were consistent with the objective medical evidence and reasonably accounting for the effects of stress in the mental RFC.  (ECF Doc. 11, pp. 9-10.)

**1.      Legal Standard for Evaluating Subjective Symptoms**

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336

F.3d at 476; *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 49463 (Oct. 25, 2017) (explaining that statements of symptoms alone are not sufficient to establish a physical or mental impairment or disability).

Under the two-step process to assess the limiting effects of symptoms, the first step is to determine whether there is a medically determinable impairment that could reasonably be expected to produce the symptoms. SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)). If there is such an impairment, the second step is to evaluate of the intensity and persistence of the symptoms to determine the extent to which they limit the performance of work-related activities. *See id*.

In analyzing the second step, an ALJ should consider the objective medical evidence, subjective complaints, information about the claimant's prior work record, and information from medical and non-medical sources. 82 Fed. Reg. at 49464-49466; 20 C.F.R. § 404.1529(c)(3). Relevant factors include daily activities, types and effectiveness of medications, treatment to address symptoms, and other factors concerning functional limitations and restrictions due to pain or other symptoms. *Id*. An ALJ need not discuss all regulatory factors he considers, only those he finds pertinent to the case. 82 Fed. Reg. at 49467. But the ALJ's analysis "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id*.

**2.      The ALJ Appropriately Evaluated Plaintiff's Mental Health Symptoms**

Ms. Pirtle's challenge to the ALJ's analysis of her mental health symptoms focuses first on the ALJ's finding that her "statements about the intensity, persistence, and limiting effects of her symptoms . . . are inconsistent with the relatively minimal treatment record and lack of documentation of significant distress or panic during treatment visits." (ECF Doc. 9, p. 10

15

(quoting Tr. 21).)  Focusing on the noted "lack of documentation of significant distress or panic during treatment visits," Plaintiff argues "allegations and symptoms do not have to be personally observed by medical professionals" in order to be "found credible."  (*Id.*)  The Commissioner responds that it was appropriate for the ALJ to "consider[] whether Plaintiff's allegations were consistent with the medical evidence as one factor in his RFC analysis."  (ECF Doc. 11, p. 10.)

Consistent with the Commissioner's arguments, the Court finds the ALJ's consideration of Plaintiff's objective presentation at treatment visits was both appropriate and merely "one factor" in the ALJ's symptom analysis.  As to the first point, it is well established that objective medical evidence is an appropriate consideration in a subjective symptom analysis.  As the Sixth Circuit explains, an ALJ "must consider how closely a claimant's self-reported symptoms line up with objective medical evidence and other evidence in the record."  *Showalter v. Kijakazi*, No. 22-5718, 2023 WL 2523304, at *3 (6th Cir. Mar. 15, 2023) (citing 20 C.F.R. § 404.1529(a)). Under the regulations, ALJs are instructed to consider objective medical evidence "a useful indicator" of the intensity and persistence of a claimant's symptoms and the effect of the symptoms on her ability to work.  20 C.F.R. § 404.1529(c)(2).  But the regulations recognize that "symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone."  20 C.F.R. § 404.1529(c)(3).  Thus, an ALJ should "carefully consider any other information [a claimant] may submit about [her] symptoms," *id.*, and may not reject statements about the intensity or persistence of the symptoms "solely because the available objective medical evidence does not substantiate [her] statements," 20 C.F.R. § 404.1529(c)(2).

As to the second point, it is clear from a review of the ALJ's written decision that Ms. Pirtle's objective presentation at treatment visits was only one of several factors considered by

the ALJ in his symptom analysis.  First, immediately after acknowledging Plaintiff's subjective complaints, including "anxiety attacks" and "difficulty . . . handling stress," the ALJ explained:

> but [Ms. Pirtle] also reported that she cared for her autistic child, cleaned, drove her ill parents to medical appointments, had no problem with personal care, cooked from scratch daily, cleaned laundry, took out trash, mowed when it was too much for her husband, dusted, swept, went outside daily, drove, grocery shopped, crocheted, spent time with others by text and video chat, had lunch with others, and could pay bills, count change, handle a savings account, and use a checkbook (4E). She reported no problems getting along with others (4E/6), and got along "good" with authority figures (4E/7).

(Tr. 20-21.)  Second, focusing on the language quoted in Plaintiff's brief, the ALJ explained not only that Plaintiff's subjective complaints were inconsistent with her presentation at treatment visits, but also that they were inconsistent with her "relatively minimal treatment record."  (Tr. 21.)  Third, the ALJ also asserted more broadly that he found the subjective complaints "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision" (*id.*), before providing a detailed summary of the medical evidence, including complaints to providers, examination findings, diagnoses, medications, and reported compliance with treatment recommendations (Tr. 21-23), and ultimately concluding:

> In summary, the record confirms diabetes and mental health diagnoses but little in the way of treatment or documentation of significant, persistent pain or panic. . . . Her mental symptomatology is aggravated by stress. Accordingly, she is limited to simple routine repetitive tasks not at a production rate pace (e.g., no assembly line work), and to simple work-related decisions. She can frequently interact with supervisors and occasionally with coworkers and the public.
>
> The claimant's explanation upon cross questioning at the hearing by her representative indicating that her limited treatment was based on cost or insurance concerns does not explain the near total absence of any kind of treatment for extended periods, or the apparent lack of effort in searching for more affordable treatment.

(Tr. 23.)

The ALJ thus considered the factors set forth in SSR 16-3p, provided "specific reasons for the weight given to the individual's symptoms," and made findings that were "consistent with

17

and supported by the evidence."  SSR 16-3p, 82 Fed. Reg. 49462, 49467.  Specifically, the ALJ considered Plaintiff's subjective complaints regarding panic attacks and mental health symptoms aggravated by stress, but also considered her significant activities of daily living, her objective presentation and mental status findings at treatment visits, the fact that there was "little in the way of treatment or documentation of significant persistent . . . panic," and the "near total absence of any kind of treatment for extended periods" and "apparent lack of effort in searching for more affordable treatment," before adopting mental RFC limitations to account for mental health symptoms that were "aggravated by stress."  (Tr. 20-23.)  Ms. Pirtle has therefore failed to show that the ALJ erred by finding her subjective complaints were "inconsistent with the . . . lack of documentation of significant distress or panic during treatment visits."  (Tr. 21.)

Ms. Pirtle also argues that the ALJ "did not consider all evidence" in his analysis, and "failed to explain how the supportive evidence was inconsistent with Plaintiff's allegations." (ECF Doc. 9, p. 12.)  In support, she cites: her own subjective complaints in her January 2023 function report and her April 2024 testimony; treatment visits in 2020, two years before her alleged onset date; treatment visits with PA Kaufman in December 2022, January 2023, and April 2024; and the consultative psychological examination from April 2023.  (*Id.* at pp. 12-15.) Citing to these records, she argues "the ALJ failed to account for the fact that, when Plaintiff's stress aggravates her symptomology, she has panic attacks that have caused absences when working, and, since she stopped working, she continued to have bad days resulting from her mental impairments."  (*Id.* at p. 15.)  The Commissioner responds that "the ALJ acknowledged Plaintiff's complaints of difficulty handling stress at multiple points throughout his decision" and "reasonably accounted for the effects of stress" in the RFC.  (ECF Doc. 11, p. 10.)

18

As an initial matter, the ALJ was not required to discuss all of the evidence in his decision, but to consider the evidence as a whole and reach a reasoned conclusion.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)).  That said, the ALJ did discuss much of the evidence highlighted in Plaintiff's brief, including:

- A January 2023 function report where Plaintiff complained of "anxiety attacks" and "difficulty . . . managing stress," but also described a variety of significant daily activities, as outlined above (Tr. 18, 20-21);

- Plaintiff's April 2024 testimony, where she reported anxiety and panic attacks, described her panic attacks, reported taking anti-anxiety medication, said she had not had a bad panic attack since the beginning of the year, and reported that she stayed away from people, had difficulty going to bigger stores, and did not attend church due to anxiety and/or panic attacks (Tr. 19, 21);

- Notes for a December 2022 treatment visit with PA Kaufman, which did not identify Plaintiff's mental impairments as an active problem but noted that Plaintiff reported being "very much stressed" and was prescribed Buspirone and Sertraline (Tr. 21-22);

- Notes for a January 2023 treatment visit with PA Kaufman, which noted Plaintiff's report of uncontrolled anxiety (Tr. 22);

- The April 2023 consultative psychological examination, where Plaintiff reported panic attacks when driving to unfamiliar places and anxiety in crowded stores and on examination "appeared depressed, anxious, and nervous and had a dysphoric affect, fidgety posture, low energy, and at times circumstantial speech with marginally adequate receptive language skills, but . . . displayed good eye contact and was fully cooperative, casually dressed, adequately groomed, 100% understandable, and fully oriented" (Tr. 18-19 (citing Tr. 355-56); *see* Tr. 22 (same)); and

- A consultative medical examination, also in April 2023, where Plaintiff was—in contrast—"observed to be clean, pleasant, and in no distress, and showed no signs of anxiety during the exam" (Tr. 18 (citing Tr. 348); *see* Tr. 22 (same)).

Although the ALJ discussed much of the evidence highlighted in Plaintiff's brief, some records highlighted by Plaintiff were not addressed in the ALJ's decision, including: treatment records from 2020—two years before the alleged onset date—which indicate that Ms. Pirtle reported to her provider that she was using intermittent FMLA leave and obtained medical

19

authorization for further leave based on diabetes and anxiety; and Plaintiff's report to the consultative examiner that she had used FMLA leave in 2021 due to her anxiety and blood sugar. (ECF Doc. 9, pp. 13-15 (citing Tr. 353, 381, 390-94, 399, 401-03, 406-10).)  Ms. Pirtle argues on this basis that the "ALJ failed to acknowledge that Plaintiff had actual absences and FMLA protection due to the severity of her anxiety and panic attacks."  (*Id.* at p. 14.)

Because the ALJ "failed to account for the fact that . . . [Plaintiff] has panic attacks that have caused absences when working," Ms. Pirtle argues the "ALJ's decision fails to account for Plaintiff's actual absenteeism-related limitations documented in the record."  (*Id.* at p. 15.)  In particular, she cites to FMLA paperwork approved by CNP Beattie in June 2020—two and a half years prior to the alleged onset date—as "proof supporting . . . Plaintiff's allegations that she would be off task or absent at a level exceeding employer tolerances."  (*Id.* at p. 16 (citing Tr. 402, 406).)  The Court is not persuaded by this argument.

While the Sixth Circuit has held that evidence predating an alleged onset date is not "necessarily irrelevant" because it "may help establish disability" when it is "evaluated in combination with later evidence," *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 414 (6th Cir. 2006) (emphasis removed), it has also observed—for example—that "[m]edical opinions that predate the disability onset date have limited relevance," *Hardy v. Comm'r of Soc. Sec.*, No. 24-5440, 2025 WL 1292181, at *5 (6th Cir. Feb. 6, 2025).  Thus, while Ms. Pirtle's treatment records from several years before her alleged onset are not "necessarily irrelevant," they have "limited relevance" in assessing her functioning during the alleged disability period.[2]

---

[2] Social Security regulations require the agency to develop a "complete medical history for at least the 12 months preceding the month" in which an application is filed, 20 C.F.R. § 404.1512(b)(1), and "consider all evidence in the case record" when making a determination, 20 C.F.R. § 404.1520(a)(3), but specify that the RFC will be assessed "based on all the *relevant* evidence in [the] case record," 20 C.F.R. § 404.1545(a)(1) (emphasis added).

A review of the FMLA-related records cited by Plaintiff reveals the following:

- On March 16, 2020, Plaintiff reported worsening anxiety and depression due to "[a lot] more stress at home," saying she "[m]isse[d] work about 1 day per month d/t this – ha[d] FMLA intermittently," had "[m]ore anxiety, feeling like her skin is crawling in social places" and wanted to "try something to use" as needed (Tr. 390); she was started on Vistaril, as needed for anxiety, and her Zoloft was increased (Tr. 393);

- On May 19, 2020, Plaintiff reported the increase in Zoloft was effective and she "really f[elt] great outside of work," but her "issue" was "about having to wear a mask at work" because she felt "she [could] not breathe with the mask at work" and it caused a "full blown panic attack," but she did not feel she would have a panic attack with "hand made masks" (Tr. 395); Plaintiff explained as to her "anxiety symptoms overall" that it was "just the masking that [wa]s making her anxious," and CNP Beattie advised that she could not write a note saying Plaintiff could not work due to the mask, and could not recommend that Plaintiff work without a mask (Tr. 398);

- On June 11, 2020, Plaintiff requested two FMLA forms, "one for 3 weeks due to caring for her son" and one for intermittent FMLA relating to "her anxiety and her [diabetes]," explaining that she recently missed work due to low blood sugar but felt it was due to her anxiety (Tr. 399); CNP Beattie continued "intermittent FMLA for her DM and anxiety at 2 days max per month" (Tr. 402);

- On June 23, 2020, Plaintiff reported that she was due to return to work following FMLA leave due to "increased anxiety" and her "need to get appointments in order [due to] her son's new d[iagnosis] of Autism," but that she had worsening anxiety due to her father's health, felt she could not concentrate to safely work as a machine operator, and worried about getting adequate sleep while caring for her son (Tr. 403); CNP Beattie agreed to "extend her FMLA," but advised her that her leave time was limited and would be under review with her employer (Tr. 406);

- Five months later, on November 19, 2020, Plaintiff reported worsening stress that was "partly related to her family circumstances" and requested additional FMLA paperwork allowing her to stay off work until November 30th (Tr. 407); Dr. Mallapareddi adjusted Plaintiff's medications and advised her to bring her FMLA paperwork to the clinic (Tr. 410); and

- On April 24, 2023, Plaintiff reported to the consultative examiner that she was let go by her employer of three years in October 2021 because her "FMLA paperwork was not accurate" and "because of truancy and fighting with the doctor" (Tr. 355).

Thus, the records suggest Plaintiff intermittently reported anxiety or panic attacks impacting her ability to work in 2020, often in the context of environmental or family stressors, and largely in the context of asking providers to sign FMLA paperwork.  The treatment was sporadic and ended

21

in November 2020, after which Plaintiff apparently did not participate in further mental health treatment until December 2022.  (*See* Tr. 317-18.)  Further, Plaintiff later reported she was let go by her employer of three years in 2021 due in part to inaccurate FMLA paperwork.  (Tr. 355.)

Since the medical records in question precede the alleged disability period by over two years, reflect sporadic treatment followed by a two-year break in treatment, and tie reported symptoms largely to environmental and/or family stressors specific to the time of the treatments, the Court finds the records to be of limited relevance to the present disability determination.  Accordingly, although the ALJ was permitted to consider the records in his decision, his failure to explicitly discuss those records in the context of his symptom analysis did not deprive his findings of the support of substantial evidence.  *See Boseley*, 397 F. App'x at 199 (finding ALJ need not discuss all evidence but consider all the evidence and reach a reasoned conclusion).

For all of the reasons set forth above, the Court finds the ALJ appropriately addressed Ms. Pirtle's subjective complaints of mental health symptoms in accordance with regulatory requirements articulated in SSR 16-3p, that his findings were supported by substantial evidence, and that Ms. Pirtle has not met her burden to demonstrate otherwise.  Accordingly, the Court finds the first assignment of error is without merit.

**C.  Second Assignment of Error: The ALJ Properly Evaluated the Persuasiveness of the Medical Opinions and Adopted an RFC Supported by Substantial Evidence**

In her second assignment of error, Ms. Pirtle argues that the ALJ failed to follow the regulations when he rejected limitations from the medical opinions of the two consultative examiners and the state agency psychological consultants, and then "failed to adequately explain how the evidence supports the RFC finding in the absence of a medical opinion."  (ECF Doc. 9, pp. 17-25.)  The Commissioner responds that the ALJ properly evaluated the medical opinions

and included appropriate limitations in the RFC and argues Plaintiff has failed to show that the ALJ's findings lacked the support of substantial evidence.  (ECF Doc. 11, pp. 11-14.)

### 1.      Framework for the Evaluation of Medical Opinion Evidence

The regulations governing the evaluation of medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)." 20 C.F.R. § 416.920c(a).  Those five factors include supportability, consistency, relationship with the claimant, specialization, and other factors; but the most important factors are supportability and consistency.  20 C.F.R. §§ 416.920c(a), 416.920c(b)(2), 416.920c(c)(1)-(5).  ALJs must therefore explain how they considered consistency and supportability but need not explain how they considered other factors.  20 C.F.R. § 416.920c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.

23

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated his reasons for finding the opinion unpersuasive; and made findings supported by substantial evidence.  *See* 20 C.F.R. § 416.920c (governing how ALJs consider and articulate findings re: medical opinions); 20 C.F.R. § 416.920(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405.

### 2. The ALJ Properly Evaluated the Opinion of the Consultative Medical Examiner and Adopted a Physical RFC Supported by Substantial Evidence

In her second assignment of error, Ms. Pirtle argues first that the ALJ improperly "rejected the standing and walking limitations" in consultative examiner CNP McFarlane's medical opinion and "failed to adequately explain how the evidence supports the RFC finding in the absence of a medical opinion." (ECF Doc. 9, p. 17.)  While she does not challenge the ALJ's finding that the state agency medical consultants' opinions—which concluded that Plaintiff did not have severe physical impairments—were unpersuasive, she argues that the ALJ improperly "rejected [CNP] McFarlane's opinion that Plaintiff could stand and walk less than 2 hours a day, and failed to explain how Plaintiff's neuropathy was insufficient to cause such limitations." (*Id.* at pp. 18-19.)  The Commissioner responds the ALJ properly explained his reasons for finding CNP McFarlane's opinion only "somewhat persuasive." (ECF Doc. 11, p. 11.)

The ALJ summarized CNP McFarlane's examination findings as follows:

In April 2023, Barbara McFarlane, APRN, performed an independent consultative exam and noted that the claimant was five feet, seven inches tall, and weighed 229 pounds (3F/9). Ms. McFarlane observed that the claimant was clean, calm, pleasant, and in no distress, and showed no signs of anxiety during the exam (3F/10). <u>She was able to ambulate to the exam room without any difficulty and sit and rise from a chair without any problems. She was able to remove her shoes, put her shoes back, tie her shoes, and pick up a coin without any difficulty.</u> She had normal grip strength in her hands. <u>She had a normal steady gait and was able to tandem walk, walk on her heels and toes, hop, bend, and squat without any difficulties.</u> She had normal motor function in all extremities. Range of motion was normal throughout. There

were no areas of muscle tenderness or trigger points (3F/11). <u>There was no evidence of diabetic neuropathy on exam</u> (3F/11).

(Tr. 22 (emphasis added).)  This is consistent with CNP McFarlane's examination report, which

contained the following findings under "Diagnosis and Prognosis":

> 1. Diabetes type II. This is based on the claimant's history. I do feel that she could benefit from a dietitian. The claimant does state that her diet is "bad".
>
> 2. <u>Diabetic neuropathy</u>. This is also based on her history. <u>I did not see any evidence during this exam</u>. Once again I feel she would benefit from a dietitian and possibly medication to help with her symptoms i.e. Gabapentin or a similar medication. Overall I feel the claimant's symptoms could be relieved with education on a proper diet and medication.

(Tr. 349 (emphasis added).)  After summarizing both CNP McFarlane's findings and the other

treatment records, the ALJ discussed CNP McFarlane's medical opinion as follows:

> Ms. McFarlane, who performed the above-summarized independent consultative exam, opined that the claimant could stand and walk less than 2 hours a day but needed no assistive devices and could lift 50 pounds occasionally and 25 pounds frequently (3F/11-12). Ms. McFarlane opined that the claimant had no sitting, postural, manipulative, or environmental work-related limitations (3F/12). <u>This assessment is only somewhat persuasive, as Ms. McFarlane's substantially normal physical exam findings do not support a standing and walking limitation of less than 2 hours</u>, though her conclusion of no limitations in other areas is supported by exam findings. <u>The standing and walking limitation is also inconsistent with the above-summarized record in which treatment exams note a normal gait and motor strength</u>.

(Tr. 24 (emphasis added).)  Thus, the ALJ assessed the supportability of the "standing and

walking limitation of less than 2 hours" by finding the limitation was not supported by "Ms.

McFarlane's substantially normal physical exam findings."  (*Id.*)  The ALJ also assessed the

consistency of the limitation, noting it was "also inconsistent with the above summarized record

in which treatment exams note a normal gait and motor strength."  (*Id.*)  True to this observation,

the ALJ had previously summarized treatment records noting Ms. Pirtle's normal gait and motor

strength on examination in January 2023 and April 2024.  (*See* Tr. 22-23 (citing Tr. 366, 419).)

25

Ms. Pirtle argues that the ALJ's analysis of CNP McFarlane's opinion is inadequate because the ALJ "failed to compare the treatment records relevant to diabetes and neuropathy to the opinion of Ms. McFarlane." (ECF Doc. 9, p. 20.)  But the ALJ clearly considered Plaintiff's neuropathy is assessing CNP McFarlane's opinion, since he highlighted CNP McFarlane's own finding that "[t]here was no evidence of diabetic neuropathy on exam."  (Tr. 22 (citing Tr. 349).)  There is also no dispute that the ALJ considered the April 2024 exam highlighted in Plaintiff's brief, acknowledging that Ms. Pirtle "reportedly had pins and needle sensation in her lower extremities and f[oo]t paresthesias with light touch" on examination, but "had a normal gait."  (Tr. 23 (citing Tr. 419).)  Indeed, this exam was referenced in the analysis of CNP McFarlane's opinion, when the ALJ referred to exams in the "above-summarized record . . . which note a normal gait and motor strength" (Tr. 24), referencing the only two examinations in which the ALJ noted such findings (*see* Tr. 22-23).  Thus, Plaintiff has failed to show that the ALJ did not consider or properly account for records relating to her peripheral neuropathy when he declined to adopt CNP McFarlane's opinion regarding reduced standing and walking limitations.

Ms. Pirtle's additional vague arguments that the ALJ did not "adequately explain how the evidence supports the RFC finding in the absence of a medical opinion" and should not "play doctor" or interpret "raw medical data" (ECF Doc. 9, pp. 17-19) do not change the analysis.  The Sixth Circuit has "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."  *See Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401-02 (6th Cir. 2018) (citing *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-43 (6th Cir. 2017) and *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)); *see also Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (finding an ALJ "is not required to recite the

medical opinion of a physician verbatim in [her] residual functional capacity finding"). This is because "[t]he responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Poe*, 342 F. App'x at 157 (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)). An ALJ must assess a claimant's "residual functional capacity based on all the relevant evidence in [the] case record," 20 C.F.R. § 404.1545(a)(1), and "does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding," *Poe*, 342 F. App'x at 157.

Here, in support of his light physical RFC findings (Tr. 20), the ALJ considered the treatment records and examination findings (Tr. 21-23), found the opinions of the state agency medical consultants (finding no severe physical impairments) unpersuasive because they "did not have a complete record" (Tr. 23), and found the opinion of the consultative examiner "only somewhat persuasive" because her standing and walking limitations were not supported by or consistent with the evidence (Tr. 24). Ms. Pirtle has not met her burden to show that the physical RCF findings adopted by the ALJ lack the support of substantial evidence.

>     **3.**     **The ALJ Properly Evaluated the Opinions of the Consultative Psychological Examiner and State Agency Psychological Consultants and Adopted a Mental RFC Supported by Substantial Evidence**

Ms. Pirtle next argues that the ALJ erred in evaluating the opinions of the consultative psychological examiner and state agency psychological consultants because he adopted a mental RFC that found her capable of "frequently interact[ing] with supervisors and occasionally with coworkers and the public" (Tr. 20) even though the psychological opinions supported different limitations in interacting with others. (ECF Doc. 9, pp. 21-25.) The Commissioner responds that the ALJ properly evaluated the state agency psychological consultants' opinions and explained his reasons for not adopting a limitation to "superficial" interactions. (ECF Doc. 11, p. 12.) The Commissioner further responds that the ALJ properly assessed the opinion of the consultative

27

psychological examiner, finding it somewhat persuasive and generally consistent with the record, but rejecting any speculative opinions using terms like "may" and "likely." (*Id.* at pp. 12-13.)

### i.    The ALJ Adequately Assessed the State Agency Opinions and Adopted a Mental RFC Supported by Substantial Evidence

The ALJ assessed the opinions of the state agency psychological consultants as follows:

> State Agency reviewing psychologists Matthew Wong, PhD, and Larry Kravitz, PsyD, assessed that the claimant was capable of simple routine work tasks that did not require fast paced production standards; <u>superficial interaction with the general public, supervisors, and coworkers</u>; and routine tasks that do not require frequent changes (2A and 4A). <u>This assessment is somewhat persuasive as it is generally supported by the nature of the claimant's mental impairments and a cite to the relevant evidence at the time it was made, but it is not entirely consistent with the above-summarized complete evidence of record documenting that the claimant has interacted adequately during consultative examinations and medical visits, which suggests that she does not require a limitation to superficial interaction</u> within the context of simple routine repetitive tasks, only simple work-related decisions, no more than frequent interaction with supervisors, and no more than occasional interactions with coworkers and the public.

(Tr. 23 (emphasis added).)  Before making this finding, the ALJ acknowledged Plaintiff's complaints of anxiety attacks and difficulty handling stress, but noted that she reported daily activities that included caring for an autistic child, driving her parents to medical appointments, grocery shopping, and having lunch with others, and further that Plaintiff reported she had "no problems getting along with others . . . and got along 'good' with authority figures." (Tr. 18, 20-21 (citing Tr. 265-66).)  Further, in keeping with his reference to "above-summarized complete evidence of record documenting that the claimant has interacted adequately during consultative examinations and medical visits" (Tr. 23), the ALJ had summarized treatment records where Plaintiff presented as "healthy-appearing" (Tr. 22 (citing Tr. 366)), "clean, calm, pleasant, and in no distress" with "no signs of anxiety" (Tr. 18 (citing Tr. 348), Tr. 22 (same)), "quietly cooperative" with "good eye contact," but "depressed, anxious, [and] nervous" with "a dysphoric affect, fidgety posture, low energy, and at times circumstantial speech" (Tr. 22 (citing Tr. 355-

28

56)), and "unhappy but composed" with "[n]o distress observed" (Tr. 22 (citing Tr. 415)).  After summarizing the records, the ALJ found "little in the way of treatment or documentation of significant, persistent pain or panic," but concluded that Plaintiff's "mental symptomatology [wa]s aggravated by stress."  (Tr. 23.)  After discussing the opinion evidence, the ALJ explained:

> The State Agency found only partial consistency regarding the claimant's allegations, noting that that the preponderance of evidence indicated that the claimant was only somewhat restricted by her mental symptoms and would not be wholly compromised in the ability to function on simple tasks within a work setting (4A/4). . . . The claimant's level of activity, as summarized throughout this decision and which includes taking care of her autistic son, taking her parent(s) to medical appointments, running errands, and driving, is inconsistent with the level and persistence of symptoms that she alleges. The record documents only conservative, non-invasive treatment. Medications have helped control or reduce her symptoms, and her RFC accommodates potential side effects from her medication.

(Tr. 24.)

In challenging the ALJ's analysis of these opinions, Ms. Pirtle focuses on his rejection of the limitation to "superficial" interaction, and replacement of that limitation with a limitation to frequent interactions with supervisors and occasional interactions with coworkers and the public.  First, Plaintiff argues that the state agency and consultative examiner opinions do not support a greater ability to interact with supervisors as compared to coworkers and the public.  (ECF Doc. 9, p. 21.)  Second, she asserts that her ability to interact at treatment visits and consultative examinations is not reflective of an ability to perform work activities on a sustained basis.  (*Id.* at pp. 22-23.)  Third, she argues that her behavior at treatment visits and examinations does not support an ability to interact frequently with supervisors because there is only a "minimal treatment record" with "four treatment notes between December 2022 and April 2024."  (*Id.* at p. 23.)  And finally, she argues that "a limitation to occasional interactions does not encompass the limitation to superficial interaction."  (*Id.* at p. 24.)  These arguments are not persuasive.

As to the ALJ's adoption of an RFC limitation to frequent interactions with supervisors and occasional interactions with others, as noted above, "[t]he responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Poe*, 342 F. App'x at 157 (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)).  Thus, the RFC limitations adopted by the ALJ did not need to be based on the verbatim opinion of a medical source. *See Mokbel-Aljahmi*, 732 F. App'x at 401-02; *Poe*, 342 F. App'x at 157.  Here, the cited evidence regarding Ms. Pirtle's daily activities, her presentation at medical appointments, and her own report that she did not have problems getting along with others and got along "good" with authority figures are sufficient to provide substantial evidence to support the interaction limitations in the RFC.

As to the usefulness of considering Plaintiff's presentation at medical appointments, it is clear from the ALJ's written analysis—as also discussed in Section V.B., *supra*—that Plaintiff's presentation at medical appointments was only one factor considered by the ALJ in assessing the RFC.  And as to the cases finding a distinction between "occasional" and "superficial" interactions, the ALJ recognized the distinction when he found the record "suggests that [Plaintiff] does not require a limitation to superficial interaction within the context of simple routine repetitive tasks, only simple work-related decisions, no more than frequent interaction with supervisors, and no more than occasional interactions with coworkers and the public." (Tr. 23.)  Thus, the ALJ appropriately recognized that his RFC "conflict[ed] with an opinion from a medical source," and "explain[ed] why the opinion was not adopted." SSR 96–8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34478 (July 2, 1996).

For the reasons set forth above, the undersigned finds Ms. Pirtle has not met her burden to show that the ALJ lacked substantial evidence or failed to adequately articulate his reasons for finding the state agency psychological consultants' opinions "somewhat persuasive" and

30

adopting a mental RFC that limited the frequency of Plaintiff's interactions with supervisors,

coworkers, and the public, but did not limit Plaintiff to "superficial" interactions.

### ii.    The ALJ Also Adequately Assessed the Opinion of the Consultative Psychological Examiner

The ALJ assessed the opinion of the consultative psychological examiner as follows:

> Dr. Groneck, who performed the above-summarized independent psychological evaluation, concluded that the claimant could manage her funds independently and was not expected to have problems understanding or remembering job instructions, though her depressive symptoms might present barriers to adequate focus and concentration, and her persistence and pace might be lessened by decreased energy and anxiety (4F/7-8). Dr. Groneck opined that, due to reported panic attacks, the claimant might experience increases in symptoms when working in crowded work environments, and, due to depression, would likely struggle to adapt to change in work routine and might have difficulty coping with changes in her work routine due to low frustration tolerance (4F/8). Dr. Groenck opined that panic attack symptoms might increase when the claimant was in a high stress environment (4F/8). Dr. Groneck's assessment is somewhat persuasive, as it is generally supported by the evaluation observations and testing, and is generally consistent with the above-summarized record documenting that stress aggravates the claimant's mental symptomatology. However, Dr. Groneck's assessment is, in part, speculative in that it uses terms such as "may" and "likely,", though the general impression that stress aggravates the claimant's mental functioning is supported by Dr. Groneck's evaluation observations and testing, and is consistent with the record.

(Tr. 24 (emphasis added).)

Pointing to Dr. Groneck's opinion that Plaintiff "may experience increases in symptoms

when working in crowded work environments" (Tr. 358), Ms. Pirtle argues that the ALJ

improperly "substitut[ed] his lay opinion for Dr. Groneck's medical opinion" when he adopted

an RFC that limited her interactions with supervisors less than it limited her interactions with

coworkers and members of the public.  (ECF Doc. 9, p. 21.)  This argument is not persuasive for

two reasons.  First, as discussed above, the ALJ was not required to base his RFC limitations on

a verbatim opinion from any medical source.  *See Mokbel-Aljahmi*, 732 F. App'x at 401-02; *Poe*,

342 F. App'x at 157; *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).

Second, the ALJ found Dr. Groneck's opinion "somewhat persuasive" in part because the opinion was "speculative in that it uses terms such as 'may' and 'likely.'" (Tr. 24.) This is an appropriate basis to find a medical opinion less persuasive. *See Ackles v. Comm'r of Soc. Sec.*, 470 F. Supp. 3d 744, 747 (N.D. Ohio 2020) ("The vagueness of a medical opinion is a proper basis on which to afford it less weight.") (citing *Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 476 (6th Cir. 2008)); *see also Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 431 (6th Cir. 2018) (upholding finding that opinion warranted "little weight" for reasons that included a finding that the opinion was "quite vague").

Thus, the ALJ properly found the opinion that Ms. Pirtle "may" experience increased symptoms in crowded work environments speculative, while concluding that "the general impression that stress aggravates [Plaintiff]'s mental functioning" was supported by Dr. Groneck's findings and consistent with the record. (Tr. 24.) Plaintiff has not shown that the ALJ erred in assessing Dr. Groneck's opinion as to interaction limitations, or that the RFC interaction adopted by the ALJ lacked the support of substantial evidence.[3]

Ms. Pirtle also challenges that ALJ's consideration of Dr. Groneck's opinions that her "depressive symptoms may present barriers to adequate focus and concentration" and her "persistence and pace may be lessened by decreased energy and anxiety." (Tr. 358; *see* ECF Doc. 9, p. 24.) Despite conceding that the quoted language is vague, Plaintiff argues that Dr. Groneck "assessed additional limitations relating to focus, concentration, persistence, and pace that are more restrictive than the RFC finding and consistent with off task limitations." (ECF Doc. 9, p. 24.) On the contrary, Dr. Groneck's speculative assertions that symptoms "may" present undefined barriers to focus and concentration and "may" reduce persistence and pace by

---

[3] It is also noted that Dr. Groneck's opinion found Ms. Pirtle was "not expected to show problems getting along with coworkers, supervisors, or the general public." (Tr. 358.)

undefined amounts are not "more restrictive" than the limitations adopted in the RFC.  *See, e.g., Fuller v. Comm'r of Soc. Sec. Admin.*, No. 1:20-CV-611, 2021 WL 463145, at *12 (N.D. Ohio Feb. 9, 2021) (finding no error when an ALJ did not include a need for occasional flexibility with breaks in the RFC where "the opinion state[d] that [Plaintiff] *may* need occasional flexibility, not that such flexibility is mandatory") (emphasis added) (citations omitted).

For the reasons set forth above, the undersigned finds Ms. Pirtle has not met her burden to show that the ALJ lacked substantial evidence or failed to adequately articulate his reasons for finding the consultative psychological examiner's opinions "somewhat persuasive" and adopting a mental RFC that limited Ms. Pirtle to the performance of simple routine repetitive tasks, not at a production rate pace, with simple work-related decisions, frequent interactions with supervisors, and occasional interactions with coworkers and the public.

Accordingly, the Court finds the second assignment of error to be without merit.

### VI.     Conclusion

For the foregoing reasons, the final decision of the Commissioner is **AFFIRMED.**

March 4, 2026

 */s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

33